IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 OCT 23 PM 4:24

U.S. DISTRICT COURT
N.D. OF ALABAMA

COMPASS BANK,                        )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )      CV 01-J-1330-S
                                     )
WILLIAM POWELL, et al.,              )
                                     )
            Defendants.              )
                                     )

ENTERED

OCT 2 5 2002

## MEMORANDUM OPINION

Pending before the court is the plaintiff's motion for summary judgment (doc. 139) as to its claims against defendants Philip Arcand, Robert Ellen Galway a/k/a "Robin" or Roberta Arcand, Polo Holdings, Farpoint Services International, Ltd. a/k/a/ Farpoint International Ltd., Smithfield Finance, Inc. and Garrison Corp., Inc., plaintiff's brief in support of their motion, plaintiff's narrative summary, and plaintiff's evidentiary submissions. Said defendants have failed to reply to plaintiff's motion. The court has reviewed the plaintiff's motion and other submissions.

### I. Factual Background

As part of its business, plaintiff Compass Bank, a bank incorporated in Alabama, provides a credit card sales processing service for merchants. Exh. 1, ¶¶ 4, 6. In order to obtain processing services from Compass, a merchant must complete an application form

1

or "Merchant Agreement," which requires the applicant to provide Compass with a variety of financial information. Exh. 1, ¶ 9. In making a determination as to whether to approve a Merchant Agreement, Compass examines a variety of information including a merchant's credit rating, the nature of the merchant's business, the anticipated monthly sales volume and the identity of the merchant's principal and his personal credit rating. Exh. 1, ¶ 10.

This system works as follows: A merchant receives payment by credit card from a customer for a good or service. Compass then processes the transaction for that merchant and pays the merchant the value of the credit card charge. However, if a credit card holder disputes a merchant's credit card charge, Compass is required, pursuant to its agreement with Visa or MasterCard to refund the amount of the charge to the cardholder. Exh. 1, ¶ 12. This is known in the industry as a "chargeback" transaction. Exh.1, ¶ 12; Exh. 2, ¶ 4. Additionally, should a cardholder return goods purchased from a merchant for a refund, Compass is required to reimburse the cardholder for the refund amount. This is known as a "credit transaction." Exh. 1, ¶ 13. In either of these situations, Compass must pay both the merchant and the consumer for the same transaction exposing Compass to potentially significant monetary loss.[1] Exh. 1, ¶ 14.

Due to this potential exposure to loss, Compass reviews Merchant Agreements

---

[1]This double exposure arises because when Compass receives the credit charge from the merchant it pays that merchant the cash value of the charge, but then if Compass must pay a refund to the customer, it is out for double the amount of money until the merchant refunds the value of the charge that Compass previously paid to it. Exh. 1, ¶ 14.

with varying degrees of scrutiny depending on a merchant's risk level.  Compass has a

policy against providing processing services for "high-risk" merchants, which include

infomercial and telemarketers.  Exh. 1, ¶ 16; Exh. 6, p. 3.

The alleged fraud at issue in this case is based on a process called "factoring."

"Factoring" occurs where one merchant processes the credit card sales for other

merchants.  Compass's policies, along with those from Visa and MasterCard, expressly

forbid this practice in order to avoid processing transactions of high-risk merchants under

the guise of a lower-risk merchant.  Therefore, Compass's policy provides that only one

merchant can be processed under a single merchant agreement.  Exh. 1, ¶ 18; Exh. 5 at p.

2, ¶ 10 ("The merchant shall present Bank records and Sales Drafts only of valid

transactions for sales of goods and services between itself and a bona fide Cardholder.").

Defendant Philip Arcand ("Arcand"), a Canadian citizen married to defendant

Roberta Galway ("Galway"), has had a significant amount of experience in credit card

processing.  Prior to the transactions at issue, Arcand had three prior credit card

processing relationships.  First, Arcand had a relationship with Bank of Montreal which

ultimately terminated Arcand's account due to "excessive fraud" and sued Arcand and

Galway.  Exh. 16.  The bank also placed Arcand and Galway on a watch list on July 27,

1998, listing "excessive fraud" as the reason for the termination of their account.  Exh.

16.  Being placed on this list means that any application for credit card processing would

be automatically declined.  Second, Arcand had a credit card processing relationship with

3

a bank in Nicaragua.  Exh. 4 at 81-83.  The relationship terminated for unknown reasons but Arcand fears returning to Nicaragua and has had "nightmares...of getting beaten with pipes and thrown in jail." Exh. 4 at 89.  Third, Arcand had an AmTrade account that was closed due to excessive chargebacks.  Exh. 4 at 419, 422-423.

Due to the end of these relationships, Arcand needed a new credit card processing account and came into contact with William Powell.[2]  Exh. 4 at 82-83.  Powell agreed to help Arcand set up a new processing relationship for Arcand in exchange for $145,000. Exh. 4 at 133-34.  Arcand needed this assistance because any application showing his name on the application would be automatically declined since his name was on the watch list. Exh. 1, ¶ 11.  Additionally, Arcand was a Canadian citizen with a Canadian based business and thus would have been unable to create a processing relationship with Compass due to its policy against having relationships with companies based outside the U.S. Exh. 1, ¶ 25; Exh. 4 at 300.

In September 2000, a Merchant Agreement was submitted to Compass for American Card Services (ACS).  Exh. 5.  This application listed the name Robert Stone as the principal of ACS.  *Id.*  However, Powell and Stone have both testified that Stone was merely a "strawman" for Arcand who was the real entity behind ACS.  Exh. 18 at 20-26; Exh. 17 at 184-85.  Stone is alleged to have agreed to this after Arcand made a $5000

---

[2]William Powell ran a company that acted on behalf of merchants to locate a bank that would provide a merchant with credit card processing services.  Powell lived in Las Vegas, NV and socialized and did business with Arcand on a regular basis. Exh. 1, ¶ 23; Exh. 4 at 228.

payment to him and a $10,000 payment to Powell.  Exh. 18 at 18.  On the application itself, the telephone number and bank account listed for ACS/Stone are in fact Arcand's home telephone number and personal bank account respectively.  Exh. 4 at 156-161; Exh. 5; Exh. 26.  However, Arcand has testified that he purchased the ACS business and its merchant processing relationship with Compass from Stone.[3]  Exh. 4 at 128.

Regardless, Arcand admits processing credit card transactions through Compass whether he was the original owner of the account or he acquired it from Stone.  Exh. 4 at 76-77.  When he did process credit card charges through Compass he did so by submitting credit card charges for sales made by unrelated and undisclosed merchants.  Exh. 1, ¶ 30. This is in direct contravention to the policies of Compass and federal law.  Exh. 6 at 4 (referring to "factoring" as fraud); Exh. 5 at p. 2, ¶¶ 8, 10; 15 U.S.C. § 6102; 16 C.F.R. 310.3(c)(1).

In early September, immediately upon approval of the merchant agreement and the submission of credit card sales, Compass began to pay money into the account listed on the application, Arcand's personal account.  However, by early November, Compass began to receive a large number of fraud notices from VISA regarding ACS.  Exh. 1, ¶ 30; Exh. 24.  ACS also began to experience a high chargeback rate that was well above the norm.  Of ACS's sales, 36.87% had to be refunded by Compass.  Exh. 10, ¶ 8.  In 1999, "the monthly overall chargeback rate, for all merchants in the Visa U.S.A. system,

---

[3]Arcand admits to formerly running a company named American Card Services. However, he states that Stone's ACS was a different American Card Services.

varied between .054% and .082%, the overall rate for the year was .067%." Exh. 2, ¶ 17.

In December 2000, a new merchant account was submitted to Compass in the name of Polo Holdings and again listed Stone as the owner of the company. Exh. 26. However, the address of Polo Holdings listed on the application was in fact Arcand's home address in Las Vegas. The bank account listed on the application was again a personal bank account of Arcand. Exh. 1, ¶ 35; Exh. 4 at 329; Exh. 29. Stone's signature is on the application, but he has testified that it is a forgery. Exh. 18 at 26. All of the merchants that Arcand had been processing through the ACS account were then switched over to the Polo Holdings account. Exh. 4 at 328-29. The Polo Holdings account also began to receive a high number of chargebacks that were not reimbursed. Exh. 1, ¶ 38.

In total, Compass alleges it is due a total of $4,014,590 as a result of chargebacks, processing fees, and fines incurred as a result of Polo Holdings and ACS. Exh. 57, ¶¶ 7-12.


## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment

standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.  The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of  the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the non-moving party to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro. 56(e).  In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial."  Fed. R. Civ. Pro. 56(c); *Matsushita*, 475 U.S. at 587.  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case...A genuine issue of material fact does not exist unless there is sufficient evidence favoring

the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000), quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).

### III. Analysis

#### A. Piercing the Corporate Veil / Alter-Egos

Plaintiff Compass alleges that Polo Holdings, Farpoint Services, Garrison Corp., Inc. and Smithfield Finance, Inc. are all alter-egos of defendant Arcand and where liability is imposed on one, it should be imposed on them all. Furthermore, Compass alleges that Galway assisted Arcand's fraud by serving as his alter-ego / agent in many situations.

While the corporate structure is designed to protect officers and shareholders from liability arising out of a corporation's operations, the "corporate veil" may be pierced where equity deems it necessary. *Messick v. Moring*, 514 So.2d 892, 894 (Ala. 1987). "To pierce the corporate veil a [party] must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences." *Econ Marketing, Inc. v. Leisure Am. Resorts, Inc.*, 664

8

So.2d 869, 870 (Ala. 1994). There are two instances, applicable to the circumstances

here, where piercing the corporate veil is appropriate: (1) where the corporation is

conceived or operated for a fraudulent purpose and (2) where the corporation is operated

as an instrumentality or alter-ego of an individual or entity with corporate control. *First*

*Health, Inc. v. Blanton*, 585 So.2d 1331, 1334 (Ala. 1991).

First, ACS and Polo Holdings clearly had no form of existence outside of serving

as names on a merchant account to facilitate Arcand's credit card processing business.

As noted by Arcand, "American Card Services was not a corporation, it was simply a

trade name." Exh. 4 at 54. ACS and Polo Holdings were just names and neither were

incorporated or had any employees, offices, buildings, phones or board of directors

meetings. Exh. 4, 295-96. When anyone sought to call either of these companies, the

phone would ring at Farpoint Services' office. Exh. 4 at 127-28, 301-02. The phone was

then answered "corporate office." *Id.* Then whatever company the person asked for, the

secretary would say this is that company. *Id.* Furthermore, all money from ACS and Polo

Holdings activities went directly into Arcand's personal bank accounts. Exh. 4 at 161,

167-168, 323, 329; Exh. 22. Therefore, both of these "companies" were clearly alter-

egos of Arcand. It is not even necessary to pierce the corporate veil since these entities

are not corporations.

Second, Arcand was clearly the principal behind Farpoint Services. Galway was

listed as the owner of Farpoint, but Arcand has testified that he was in total control of the

company and Galway was a mere figurehead. Exh. 4 at 42, 66-67, 510. In answer to the question of whether Galway played an active role in the company, Arcand stated:

> She did not personally. No, her name. It was by name only. I was basically the administrator of the company. If you asked her how much money it made at any specific period of time, she wouldn't know. If you asked her how many employees, she would have no idea...So my wife had no actual knowledge of what was going on day-to-day. That would be me. Exh. 4 at 66-67.

Additionally, when referring to Farpoint in his deposition testimony, Arcand frequently uses pronouns that demonstrate his consideration of Farpoint to be an extension of himself. For example, Arcand, in referring to Farpoint, states, "You can't hire a staff as good as **I** have," and "[s]o **I'm** paying money to **my** staff." Exh. 4 at 151. His statements indicate that Farpoint was a mere instrumentality of Arcand rather than a separate corporation. Additionally, the fact that Farpoint was used as a structure to assist ACS and Polo Holdings in carrying out fraudulent business (based on the routing of the phone calls) is sufficient to pierce the corporation's corporate veil. Therefore, the evidence dictates that Farpoint was Arcand's alter-ego in all of these transactions.

Third, Garrison Corporation and Smithfield Finance were both alter-egos of Arcand. All of the money paid by Compass to ACS and Polo Holdings went directly into Arcand's personal bank accounts. Exh. 4 at 161, 195-96. Arcand then transferred all of this money in his personal accounts into two offshore bank accounts at the Bank of Bermuda that were in the name of Garrison and Smithfield. Exh. 4 at 196, 215-16 (Q: "Compass pays you money...that goes into your personal bank account...[f]rom there, the

money goes to the Bank of Bermuda...into either the account of Smithfield Finance or Garrison?"; A: "Correct.").   Additionally, Arcand admittedly owns 100% of both Garrison and Smithfield Finance.  Exh. 36; Exh. 38.  Arcand also had two credit cards issued out of the Smithfield and Garrison accounts.  Exh. 35.  The charges on the credit cards clearly indicate that Arcand was using the accounts as his personal accounts.[4]  Exh. 35.  This demonstrates an utter disregard for the corporate form and points to the alter-ego status of these companies.  This further disregard for the corporate form can be seen by the lack of evidence that any meetings were ever held by either of these corporations.  Furthermore, there is no evidence that either of these corporations did anything or carried on any real business.  This supports the contention that they were mere "sham" corporations.

It is clear from all of the foregoing that Garrison, Smithfield, ACS, Polo Holdings and Farpoint were all alter-egos of Arcand.


**B. Breach of Contract**

Under Alabama law, a breach of contract has occurred where: (1) a valid contract exists between the parties in action, (2) the plaintiff has performed under the contract, (3) the defendant failed to perform, and (4) the plaintiff suffered damage.  *See, e.g., Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 673 (Ala. 2001).

---

[4]For example, on a MasterCard issued out of the Garrison and Smithfield accounts, Arcand spent $960.91 at Victoria's Secret.

A valid contract existed between Compass and Arcand through his alter-egos. ACS and Polo Holdings each entered into a Merchant Agreement with Compass. Exh. 5; Exh. 26. These agreements provided that plaintiff would pay "chargebacks" or refunds to the customers of Polo Holdings and ACS consumers as warranted. *Id.*; Exh. 1, ¶¶ 12-13. In turn, the defendants were required to reimburse plaintiff for the "chargebacks" that it paid to the defendants' customers. Exh. 5; Exh. 26.

Furthermore, plaintiff has performed as required under the Merchant Agreements with ACS and Polo Holdings. Plaintiff paid a total of $1,503,096 to Polo Holdings customers under its agreement. Exh. 57, ¶ 8. Additionally, plaintiff paid a total of $1,983,300 to ACS customers under its other agreement. *Id.* Thus, plaintiff properly performed under its agreements with the defendants.

Defendants have failed to reimburse plaintiff for these "chargebacks" as required under the Merchant Agreements. Exh. 57, ¶¶ 7-10; Exh. 4 at 225-226. As a result of this failure, plaintiff has incurred damages totaling $4,014,590.[5]

Therefore, plaintiff is entitled to summary judgment as to its breach of contract claim. Plaintiff is awarded $4,014,590 in total damages resulting from the unreimbursed payments and the uncollected fees and fines.

---

[5]Plaintiff is due the $1,503,096 and $1,983,300 under the Merchant Agreements for the chargebacks and is due uncollected processing fees in the amounts of $205,854, $319,887 and $2,453. Exh. 57, ¶¶ 7-10.

## C. Misrepresentation and Suppression

A claim for misrepresentation requires: (1) a false representation by the defendant to the plaintiff; (2) of a material existing fact; (3) on which plaintiff reasonably relied; and (4) which proximately caused injury or damage to the plaintiff. *See, e.g., Goodyear Tire & Rubber Co. v. Washington*, 719 So.2d 774, 776 (Ala. 1998).

The focus of plaintiff's claim for fraudulent misrepresentation against defendant Arcand is that he made numerous false statements to plaintiff in completing the Merchant Agreements that served as the underpinning of the parties' relationship. The agreements were both filled out in the name of Robert Stone rather than Arcand. Exh. 5; Exh. 26. However, the evidence clearly demonstrates that there is no genuine issue regarding the fact that Arcand completed the Merchant Agreements with Stone serving as a "strawman" to ensure the agreements' approval.

Stone has testified that he received a $5,000 payment from Powell in order for Arcand to use Stone's name on an application as a "straw" in order to conceal Arcand's identity. Exh. 18 at 16, 20-26. Stone's testimony is confirmed by testimony from Arcand's associate Powell and Powell's fiancé. Exh. 17 at 147, 181-94; Exh. 20 at 78 (acknowledging that Stone did not own ACS).

Arcand states that Stone had a business called American Card Services (ACS) which previously opened this Merchant Account with Compass. Arcand then alleges that he bought ACS from Stone after this Merchant Account had already been opened. Exh. 4

at 128.  Arcand asserts that Stone was a complete stranger to him prior to buying ACS.
Exh. 4 at 80, 146-47, 155.

However, the bank account listed on the Merchant Agreement for the deposit of
the revenue of credit card sales was Arcand's personal bank account.  Exh.4 at 157-161;
Exh. 5.  This bank account was opened on the exact same day that this Merchant
Agreement was filled out.  Exh. 4 at 161.  Furthermore, the telephone number on the
application next to Stone's name is in fact Arcand's home telephone number.  Exh. 4 at
156.  Arcand's testimony is thus clearly and unquestionably contradicted.

Additionally, Arcand fully admits to owning an American Card Services, S.A., but
he states that this  was a completely different business than the American Card Services
he allegedly bought from Stone.  Exh. 4 at 80-81.

Based upon the foregoing it is clear that no reasonable jury could find that Stone
was not a "strawman" for Arcand in this transaction.  In evaluating all of the evidence
before this court, it is clear that there is no genuine issue of material fact regarding who
actually filled out this application.  The testimony of Powell, Gaede and Stone, along with
the fact that the bank account and telephone number listed on the application were
Arcand's clearly demonstrates that Arcand was the true party to these agreements.

There were numerous misrepresentations on these applications.  First, as
previously demonstrated, the portion of the application listing ownership of ACS
misrepresents Stone as the owner when it was in fact Arcand.  Exh. 5; Exh. 26.  Second,

Arcand misrepresented on the application the sales volume that he expected to generate. The projected sales volume was listed as $50,000 per month. Exh. 5. However, Arcand had always anticipated that his monthly sales volume would be between $3 million and $5 million per month. Exh. 4 at 140. Arcand even described the $50,000 figure on the application as "absolutely" false. Exh. 4 at 164. Third, Arcand listed on the applications that he was in the business of "internet services." Exh. 5, 26. However, in fact, Arcand's business was to submit credit card charges to plaintiff for sales made by unrelated and undisclosed merchants.[6] Exh. 1, ¶ 30.

It is clear that plaintiff relied on these misrepresentations by Arcand to its detriment. Based upon these misrepresentations, plaintiff approved the ACS and Polo Holdings applications for merchant accounts. Exh. 1, ¶¶ 31, 37. Had Arcand provided accurate answers on these applications, the applications never would have been approved. *Id.* First, both Arcand and Galway's names would have been "auto-declined" by plaintiff as both were on a watch list to be automatically declined. *Id.* at ¶ 11. Second, both Arcand and Galway were Canadian citizens with a business based in Canada thereby making them ineligible for approval based upon plaintiff's policies. *Id.* at ¶¶ 31, 37.

Finally, plaintiff has suffered significant damage as a result of this misrepresentation. This damage is the same as that suffered by the plaintiff in their

---

[6]In addition to being a false statement, this activity is illegal and is expressly prohibited by plaintiff's policies and the language of the Merchant Agreements. Exh. 5; 15 USC § 6102; 16 C.F.R. 310.3(c)(1).

breach of contract claim.  Arcand does not dispute that plaintiff suffered those damages.
Exh. 4 at 225, 339-40.

Therefore, plaintiff is entitled to summary judgment on its claim for
misrepresentation.  Plaintiff's claim for fraudulent suppression appears to have been
brought as an alternative to the misrepresentation claim and it is thus unnecessary for the
court to discuss this claim.


## D. Conspiracy to Defraud

Plaintiff also alleges that defendants entered into a conspiracy to commit the
aforementioned fraud.  Under Alabama law, "[a] civil conspiracy requires a combination
of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful
end by unlawful means." *McLemore v. Ford Motor Co.*, 628 So.2d 548, 550 (Ala. 1993);
*see also Nelson v. University of Alabama System*, 594 So.2d 632, 634 (Ala. 1992).  In
order for a conspiracy claim to be viable, the underlying offense must also be viable.
*McLemore*, 628 So.2d at 551.

Here, multiple individuals, including defendants Arcand and Galway, worked
together to accomplish the misrepresentations to Compass.  Arcand and Powell worked
together to submit the fraudulent Merchant Agreements to the plaintiff. *See above* III(C).
Arcand needed a processing relationship with a bank but could not get one in his own
name because it was on a watch list that would cause a bank to automatically decline any

application from him. Exh. 4 at 130-144. Therefore, Arcand had Powell find him an individual that would serve as a "strawman" for the application. Powell found an individual, Robert Stone, to serve as the "strawman."[7] Exh. 17 at 192. Arcand then paid $10,000 to Powell for setting up the transaction and $5,000 to Stone. *Id.*

Additionally, Galway and Arcand conspired to prevent discovery of Arcand's true ownership and control over Farpoint. Farpoint served as one of the major cogs in the fraud scheme. Whereas both ACS and Polo Holdings were admittedly just names, Farpoint served as the backbone of those names. This is evidenced by the fact that all calls to ACS or Polo Holdings rang at Farpoint's offices and employees there handled business relating to ACS and Polo Holdings. Exh. 4 at 52, 127-28, 301-02.

Therefore, no genuine issue of material fact exists regarding the existence of a conspiracy among Arcand, Galway, and Powell to defraud plaintiff. Plaintiff is thus entitled to summary judgment as to its conspiracy claim against defendants Arcand and Galway.

## E. Unjust Enrichment and Money Had and Received

Additionally, plaintiff seeks to recover from defendant Arcand under the theories of unjust enrichment and money had and received. Under Alabama law, "[t]he essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove

---

[7]Stone was Powell's golf pro.

facts showing that defendant holds money which, in equity and good conscience, belongs

to plaintiff or holds money which was improperly paid to defendant because of mistake or

fraud." *Hancock-Hazlett General Construction Co., Inc. v. Trane Co.,* 499 So.2d 1385,

1387 (Ala. 1986).  As previously touched upon, Arcand received money from plaintiff

that it was obligated to reimburse to plaintiff. *See above* III(B).  Arcand received this

money through an elaborate fraudulent scheme that otherwise never would have been

paid to him by plaintiff. *See above* III(C).  Thus, Arcand has money which "in equity and

good conscience" belongs to the plaintiff.   Therefore, it is clear that plaintiff is entitled to

a judgment in its favor as to its claims for unjust enrichment and money had and received.


**G. Fraudulent Conveyance**

Plaintiff alleges that Arcand, through his alter-egos (Garrison), fraudulently

conveyed title of his $1,180,000 Las Vegas house to Galway.[8]  Under Alabama law, a

fraudulent conveyance has occurred where: (1) a creditor was defrauded; (2) the debtor

intended to defraud the creditor; and (3) a conveyance was made out of which the creditor

could have realized his claim or some portion of it. *Granberry v. Johnson*, 491 So.2d

926, 928 (Ala. 1986).  The intent to defraud a creditor may be proved by either actual or

constructive fraud. *Id.*  Constructive fraud can be found "where a grantor, indebted at the

_____

[8]The home at issue consists of a 1.35 acre lot containing a 5254 square foot house,
located at 9605 Verlaine Court in Queensridge subdivision, Peccole West, Parcel 19, Plat Book
91, page 47, lot 6, Block D in Las Vegas, Nevada. Exh. 45.

time, conveys property without receiving valuable consideration." *Id.* at 929. If plaintiff demonstrates this, the burden shifts to the grantee to show that "(1) the grantor owed a debt to the grantee; (2) the consideration for the conveyance was the extinguishment of the existing debt; and (3) the value of the property conveyed was no more than a fair equivalent for the debt amount." *Id.* at 929. Furthermore, "[c]onveyances of property between family members in the face of a pending suit against the grantor must undergo especially careful scrutiny." *Id.*

The home at issue was purchased in a convoluted process through several alter-egos by Arcand. The house was actually purchased using money from the account of Smithfield Finance Limited.[9] Exh. 58. However, immediately before these payments were made Arcand made two deposits from his personal account into Smithfield Finance Limited's account totaling $1,100,000. Exh. 58. Additionally, Arcand is the "100%" owner of Smithfield Finance and Garrison. Exh. 36; Exh. 38. Therefore, it is clear that Arcand was the true purchaser of this home.

After its purchase, the home was titled in the name of Garrison. Exh. 45. Thereafter, the home was transferred by Garrison to Galway. Exh. 46. However, Arcand made the decision to transfer the home to Galway.[10]

Additionally, the evidence demonstrates that plaintiff was defrauded by Arcand.

---

[9]Transfers of $100,025.00 and $780,025.00 were made by Smithfield Finance Limited to Fidelity National Title Agency of Nevada on January 23, 2001 and February 2, 2001.

[10]"I transferred the title of the house to [Galway]." Exh.4 at 284.

In determining a transferor's intent to defraud, a court should look to a variety of factors.[11] ALA. CODE § 8-9A-4.  Under Alabama law the husband-wife relationship between the transferor and transferee requires this court to closely scrutinize the transaction. *Granberry*, 491 So.2d at 929.  Arcand retains both possession and control over the property as he continues to live in the home with Galway.  This property transfer occurred 20 days after plaintiff filed the instant suit against Arcand.  Exh. 46; doc. 1. Galway apparently paid no consideration for this transfer.  Arcand stated that **after** the transfer to Galway, "**I** took a mortgage out on **my** house for $650,000." Exh. 4 at 275 (Emphasis added), 277-78.  All of these factors indicate Arcand's continued control of the property following the transfer.  In fact there does not appear to be any way in which this transfer could have incurred with more intent to defraud.

Finally, the conveyance was of property from which plaintiff could have realized a portion of their claim against Arcand.  By Arcand's own admission, all of the money paid by plaintiff for credit card sales revenues went to Arcand's personal bank accounts.  Exh. 4 at 215-16.  It was from these same bank accounts that Arcand purchased the Las Vegas property through the use of his alter-egos, which was ultimately transferred to his wife, Galway.  Exh. 58.  Therefore, this is clearly property from which plaintiff could have

---

[11] Factors to be considered under §8-9A-4 include whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by debtor was reasonably equivalent to the value of the asset transferred.

recovered a judgment from Arcand as the funds used for the Las Vegas property are the same funds that were due to be reimbursed to plaintiff by Arcand.

Thus, the transfer of the property in Las Vegas to Galway is declared void and said defendants are prohibited from transferring said property.


**F. Constructive Trust**

Plaintiff also seeks the imposition of a constructive trust on the Arcand's $1,180,000 home in Las Vegas, NV. "A constructive trust will be found when property has been either acquired by fraud, or where in the absence of fraud it would not be equitable to allow it to be retained by him who holds it." *Brothers v. Fuller*, 607 So.2d 135, 137 (Ala. 1992) *quoting Brothers v. Moore*, 349 So.2d 1107, 1108 (Ala. 1977).

Based upon the analysis above, it is clear that all of the money that was used to purchase this house was acquired by Arcand through money paid to him by Compass. It is also clear that Arcand was required to refund a large portion of the money he received from Compass and has never done so. Therefore, plaintiff is entitled to the imposition of a constructive trust, and plaintiff shall have the title, and possession of said property

## IV.  Conclusion

Based upon all of the foregoing, plaintiff Compass Bank's motion for summary

judgment is **GRANTED.**

**DONE** and **ORDERED** this the ⟨23⟩ day of October 2002.

Inge P. Johnson
U.S. District Court